O'Rourke vs. N. O., City & Lake R. R. Co. and N. O. Traction Co., Ltd.

## No. 12,939.

MR. AND MRS. JAMES O'ROURKE VS. NEW ORLEANS CITY AND LAKE RAILROAD COMPANY AND NEW ORLEANS TRACTION COMPANY, LIMITED.

### SYLLABUS.

1. A boy eleven years of age, standing at night on the off-side of the down-town track of defendant company's street railway, waiting for a car on the up-town track, which was farthest from him, to pass, and that car having passed, without looking up the track nearest him to see whether or not it was safe to cross, steps on the track twelve or fifteen feet in front of an approaching down-town car, trips and falls, is run over and his feet crushed. HELD: A case of want of care on his part barring recovery of damages, it being shown that notwithstanding effort on part of motorneer to arrest car, it could not be done in that distance.

2. The motorneer had a right to suppose the boy was waiting for his car to pass, and to expect he would remain where he was out of danger until it had passed.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Righter, J.*

E. Evariste Moise, Guinio F. Socola and John Wagner for Plaintiff, Appellant.

Denegre, Blair & Denegre for Defendants, Appellees.

Argued and submitted February 21, 1899.
Opinion handed down March 7, 1899.
Rehearing refused March 20, 1899.

The opinion of the court was delivered by
BLANCHARD, J. Plaintiffs are the parents of Walter O'Rourke.

They sue for twenty thousand dollars for his use and benefit, and for five thousand dollars on their own behalf as his parents.

The cause of action is that one of the street cars of defendants ran over the foot or lower part of the left leg of Walter O'Rourke and crushed it, in consequence of which the leg was amputated between the ankle and knee. The averment is that the injury to the boy was occasioned by the fault of defendants, through their employees.

The accident occurred about 7:30 o'clock on an evening in December, 1896.

It was a dark, cold, drizzly, winter night.

The car was running on the Prytania street line and going down town. It was an electrically propelled car, in charge of a motorneer and conductor, and several passengers were aboard.

The place of accident was on Prytania street, between Amelia and Antonine streets, in the city of New Orleans. The block between these streets is only forty-eight feet wide, and one square away, going towards the rear of the city, the two streets merge into one.

This narrow block, on the river side of Prytania street, is occupied by the barroom and grocery of Bartello Mancuso. Besides the front entrance to this bar and grocery, there are side entrances—one on Amelia street, another on Antonine street.

It was a Sunday night. In consequence the house was closed, but the side entrance on Amelia street permitted the ingress and egress of neighbors and friends visiting the Mancuso family.

Among those visiting there that Sunday afternoon and evening were Walter O'Rourke, a bright, active, intelligent lad, eleven years of age, and his younger brother, Albert, seven years old.

They were friends of the Mancuso boys and had been playing with the latter during the afternoon in the yard on the Mancuso premises back of the bar and grocery store.

When it became dark the boys came into the house and sat around the bar and grocery with the Mancusos until 7:30 o'clock, when the two O'Rourke lads left to go home.

They went out by the side entrance on Amelia street. They lived on the lower side of Antonine street, between Prytania street and St. Charles avenue, or something over half a square from the Mancusos.

Antonine street is below Amelia street, and to reach their home it was necessary for the boys to walk a few steps from the Mancuso entrance on Amelia street to Prytania, thence down Prytania to Antonine street, then across Prytania and across Antonine to the lower side of the latter, thence to their father's house.

There is evidence that when Walter O'Rourke left the Mancuso store he was chased out by Peter Mancuso, one of the boys with whom he had been playing.

Peter Mancuso so testified, and that the reason for his running after the O'Rourke boy was that the latter "had called him names."

Walter O'Rourke denies this and insists that when he left the store he did so leisurely.

This is a matter of some importance, since the evidence of the motorneer is to the effect that the boys came running from under the shed covering the sidewalk in front of the Mancuso store, and the one hurt, in his haste, jumped on the track immediately in front of the advancing car. So that if Walter was chased out of the store by Peter Mancuso, nothing was more natural than that, expecting Peter to follow, he continued his flight out across the banquette and into the street, not noticing the car until too late.

In point of fact Peter did not follow him out on the street, but stopped at the exit door.

While the testimony, for what it is worth, of the little seven year-old brother is slightly corroborative of the elder brother on this point, we incline to think the weight of evidence favors the view that the boys came running out of the side entrance of the Mancuso store, and that Walter continued his running across the banquette and into the street.

After reaching Prytania street, a few steps from the entrance on Amelia street through which he had made his hasty exit from the store, Walter O'Rourke turned down towards Antonine street, going diagonally across the banquette towards the outer curb. He reached this about midway of the front of the Mancuso store and jumped across the gutter into the street. From the curb, or outer edge of the banquette, at this point to the outer rail of the down town track of the street car line is only about thirteen feet.

He says that, noticing a car coming up town on the track farthest from him, he stopped before reaching the near track to let it pass, and then proceeding to cross, his foot tripped on an unbevelled plank laid between the rails of the track, causing him to fall, and in a moment the car was upon him.

He testifies he neither saw nor heard this car until he fell, and then he heard the motorneer call out to him to "look out," and realizing his danger he lunged himself forward and succeeded in clearing the track except as to his foot which was run over and crushed.

Continuing, he says at the time he tripped and fell the car was not over twelve feet from him. *This is a damaging statement for him.* Accepting his own version he, after leisurely waiting for an up town car on the far away track to pass, deliberately, without looking or lis-

tening for a car coming on the down town track, at a crossing which he admits was dangerous and about which he had been repeatedly cautioned, steps on to the track at a time when a rapidly approaching car is not more than twelve or fifteen feet from him.

He says the gong of the down town car was not ringing while that of the up town car was, and that the ringing of the gong on the latter car is what attracted his attention to it.

The motorman of the down town car swears the gong on his car was ringing.

But whether it was or not, and if not ringing holding it to be negligence on part of defendants, will it be seriously contended that it was not the duty of this boy, as a matter of care and prudence, to have had due regard to his surroundings and to to have looked up the down town track before venturing upon it that dark, drizzly night? Not doing this, and getting upon this track when the approaching car was only from twelve to fifteen feet from him, must be held to be such contributory negligence on his part as bars his recovery.

When he came out of the Mancuso entrance an Amelia street he had, if he had exercised it, a view up Prytania street for a considerable distance and could easily have seen an approaching down town car several blocks off. This view of the street got better and better as he approached and came on to the banquette of Prytania street, and, finally, when he passed off the banquette on to the street itself there was not only no reason why he should not have noticed and taken heed of the advancing car, even though it were not sounding a gong, but it was reprehensible want of care and negligence on his part not to have done so.

North Hudson Street Ry. Co. vs. Flanagan, 32 At. Rep., 216; Sheets vs. Connolly St. Ry. Co., 24 At. Rep., 482 (Supreme Court of New Jersey); Costello vs. Third Avenue R. R. Co., 49 N. Y. Sup., 869; Mullen vs. Street Ry. Co., 41 N. E. Rep., 664; Masser vs. Chicago, etc., Ry. Co. (Iowa), 27 N. W. Rep., 776.

"Carelessness of child eight years old, who, with his view unobstructed, runs directly in front of an approaching car, which could be plainly heard, prevents recovery for death." *Syllabus* in Morey vs. Street Ry. Co., 50 N. E. Rep., 530.

"While no one should be held to a degree of care and caution beyond his years, a boy of eleven years and four months of age can not be re-

lieved from the exercise of all care and prudence." McLaughlin vs. N. O. & Carr. R. R. Co., 48 La. Ann., 23.

If Walter O'Rourke was standing on the off side of the down town track, as he says he was, waiting for the passage of the car on the up town track, the motorneer on the down town car not then over fifteen or twenty feet away had a right, if he saw him, to suppose he was waiting for his car to pass and to expect he would remain there out of danger until it had passed. He could not anticipate the boy would carelessly attempt to cross the track just ahead of the car, and the boy having done so, and having tripped and fallen upon the track and gotten hurt, he has no case for the recovery of damages.

In Fleishman vs. Railroad Co. (Pa.), 54 At. Rep., 119, it was said: "Where a motorman saw a child standing in the street, away from the track, in time to stop the car before reaching it, without anything in its attitude to indicate that it was about to cross the track, and the child, when the car was in ten feet of it, started to cross and was run over notwithstanding the effort of the motorman to stop the car as soon as he saw the child start towards the track, the company was not liable."

See also 49 La. Ann., 7.

This car was going at about half speed, or about five and a half miles an hour. The evidence shows that to stop a car, such as the one in this case, going at that rate of speed, requires about seventy feet. At full speed, or full allowable speed, eleven miles an hour, it would have required a hundred feet or more to have arrested its progress.

When the boy started to cross the track twelve to fifteen feet ahead of the car, and the mishap of tripping and falling overtook him, it was simply impossible for the motorman to have then arrested his car in time to prevent the catastrophe.

But, with much insistance, it is urged, on behalf of the boy, that he would have gotten over safe had he not tripped and fallen, and that what caused his trip and fall was the unbeveled, projecting edge of a plank between the rails, projecting above the rail nearest the boy.

It is contended that his foot striking this projection he fell upon the track and was run over; that if the projection had not been there he would not have fallen; that the railroad company was charged with the duty of laying the planks between the rails of their tracks and keeping the same in order; that the particular plank or planks over which the boy stumbled had been newly laid, and the edges thereof

near the rail had been carelessly left unbevelled; and that these unbevelled plank edges constituted a dangerous obstruction for which the company must be held responsible.

It is shown, on part of the railroad, that the edges of the plank covering of their tracks are bevelled only to prevent the planks from being torn up by the wheels of passing vehicles getting between the rail and the ends of the planks, and not as a precaution against foot passengers stumbling over the same in crossing.

Besides, if these planks were left unbevelled, which is not established, the projection above the rail was only from a half inch to an inch, and this constitutes no such faulty construction or dangerous obstruction as would justify holding defendant company responsible in damages because of a person tripping over the same and falling.

It is a fact of universal recognition that the normal condition of the streets of cities and towns is that of unevenness much greater than what is shown here, even taking plaintiffs' view of the same.

The street and track where young O'Rourke crossed it was in a reasonably safe condition for a person exercising ordinary care and prudence. This is all that is required of municipal corporations, and the rule can hardly be extended further as to street railways.

The case of Peats vs. St. Charles Street R. R. Co., 42 Ann., 541, directly negatives plaintiffs' contention with regard to this plank over which it is claimed the boy stumbled. See also Weisse vs. City of Detroit, 63 N. W. Rep., 423; Waggener vs. Town, 26 S. E. Rep., 352; Cook vs. Milwaukee, 27 Wis., 191.

While it is not charged in plaintiffs' petition that no head-light was burning on the car in question at the time of the accident, it was argued at bar and in the brief of plaintiffs' counsel and the claim set up that its absence constituted such negligence as justified recovery. Plaintiffs' evidence fails to establish that the head-light was not burning, and the motorneer swears positively it was. Besides, all the probabilities point to its having been lighted and burning on the front of the car that night.

The judgment of the court a qua was against the pretensions of plaintiffs, and we find no ground for disturbing the same.

Judgment affirmed.